MCI TELECOMMUNICATIONS CORP., and MCImetro Access Transmission Services, Inc., Plaintiffs,

v.

GTE NORTHWEST, INC., The Public Utility Commission of Oregon and Roger Hamilton, Ron Eachus and Joan H. Smith, in their official capacities as Commissioners of the Public Utility Commission, Defendants.

Civil No. 97–1687–JE.

United States District Court, D. Oregon.

March 17, 1999.

Order Granting Reconsideration April 21, 1999.

Lisa F. Rackner, Roy Pulvers, Lindsay Hart Neil & Weigler, Portland, OR, Mark B. Ehrlich, Thomas F. O'Neil, III, MCI WorldCom Inc., Washington, DC, Jodie L. Kelley, Maureen F. Del Duca, Donald B. Verrilli, Douglas H. Hsiao, Jenner & Block, Washington, DC, for MCI.

James M. Brown, Enfield Brown Collins & Knivila, Salem, OR, Thomas M. Riordan, Charles C. Read, O'Melveny & Myers, Los Angeles, CA, Patrick F. Philbin, Kirkland & Ellis, Washington, DC, for GTE Northwest.

W. Benny Won, Michael T. Weirich, Timothy M. Wood, Department of Justice, General Counsel, Salem, OR, for Roger Hamilton, Ron Eachus, Joan H. Smith, and Oregon Public Utility Commission.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiffs MCI Telecommunications Corp. and MCImetro Access Transmission Services, Inc. (collectively "MCI"), bring this action under 47 U.S.C. § 252(e)(6) against GTE Northwest, Inc. ("GTE"), the Oregon Public Utility Commission ("PUC"), and PUC Commissioners Roger Hamilton, Ron Eachus, and Joan Smith

("the Commissioners"). GTE has asserted counter-claims against MCI and cross-claims against the PUC.

At issue are the terms of an interconnection agreement ("Agreement") between MCI and GTE, which is intended to facilitate competition in local telephone service. Each party has moved for summary judgment. GTE also has moved to stay the proceedings and for leave to dismiss its state law claims without prejudice.

## SCOPE AND STANDARD OF REVIEW

The Telecommunications Act of 1996 ("the Act"), Pub.L. No. 104–104, 110 Stat. 56, 47 U.S.C. § 153 *et seq.*, requires each incumbent local exchange carrier ("ILEC") to negotiate an interconnection agreement with any prospective competitive local exchange carrier ("CLEC") that wishes to provide local telephone service in the ILEC's service territory. 47 U.S.C. §§ 251 and 252. The Act contemplates that the ILEC and CLEC will first attempt to negotiate an Agreement. 47 U.S.C. §§ 251(c)(1) and 252(a)(1). Any remaining disputes may be submitted to an arbitrator, whose decision can be appealed to the state public utility commission. 47 U.S.C. § 252(b), (c), and (e).

Finally, "any party aggrieved" by a decision of a state public utility commission concerning such an agreement "may bring an action in an appropriate Federal district court to determine whether the Agreement ... meets the requirements of the Act." 47 U.S.C. § 252(e)(6).

■ Although the Act does not specify either the standard or scope of review, there is general agreement that review under § 252(e)(6) is confined to the administrative record. With regard to the standard of review, it is neither desirable nor practical for this court to sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act in Oregon. Rather, this court's principal task is to determine whether the PUC properly interpreted and applied the Act, which is a question of federal law that is reviewed *de novo*.

In all other respects, review will be under the arbitrary and capricious standard.

## THRESHOLD ISSUES

### 1. Effect of the Recent Supreme Court Decision

The court requested supplemental briefing regarding the effect upon this case of the Supreme Court's recent decision in *AT & T Corp. v. Iowa Util. Bd.*, —— U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

At issue in *AT & T* was the validity of numerous regulations that the Federal Communications Commission ("FCC") promulgated in 1996 to implement the Act. The regulations were to take effect on September 30, 1996. *See* 61 Fed.Reg. 45,-476 (1996). On September 27, 1996, the Eighth Circuit temporarily stayed "the effective date" of all of the regulations. *Iowa Util. Bd. v. Federal Communications Comm'n*, 96 F.3d 1116, 1118 (8th Cir.1996). On October 15, 1996, the Eighth Circuit allowed some of the regulations to go into effect, but continued to stay the FCC's pricing regulations (47 C.F.R. §§ 51.501–51.515, 51.601–51.611, 51.701–51.717) and the "pick-and-choose rule" (§ 51.809).[1] *Iowa Utilities v. F.C.C.*, 109 F.3d 418, 427 (8th Cir.1996). The Supreme Court rejected several requests (from the FCC and others) to vacate the stay.[2]

---

1. On November 1, 1996, the Eighth Circuit lifted the stay as to a few rules, none of which are applicable to this case. *Iowa Utilities*, No. 96–3321 (lead case) ("Order Lifting Stay in Part").

2. *FCC v. Iowa Util. Bd.*, 519 U.S. 978, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996) (denying request presented to Justice Ginsburg) and at —— U.S. ——, 117 S.Ct. 378, —— L.Ed.2d —— (1996) (denying request presented to Justice Thomas); *F.C.C. v. Iowa Util. Bd.*, 519 U.S. 978, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996) (denying request presented to Justice Stevens) and at —— U.S. ——, 117 S.Ct. 379, —— L.Ed.2d —— (1996) (denying request presented to Justice Thomas).

On July 18, 1997, the Eighth Circuit vacated many of the stayed FCC regulations on the ground that the FCC lacked jurisdiction to issue them. *Iowa Util. Bd. v. FCC,* 120 F.3d 753 (8th Cir.1997). The Eighth Circuit also vacated several other regulations on the merits (including at least one that had not been stayed), while affirming still others. *Id.* The stay expired once that order became effective. *Id.* at 820.

Meanwhile, the Agreement at issue here was approved by the PUC, and signed by the parties, after various disputes were resolved through arbitration. The arbitrator issued his decision on January 3, 1997, and the PUC affirmed it, with minor modifications, on February 3, 1997. MCI's petition for reconsideration was denied on May 30, 1997. All of these events occurred after the FCC regulations had been stayed, but before the Eighth Circuit issued its decision on the merits. The PUC treated the stayed regulations as persuasive authority that the PUC could, but was not required to, follow.

On July 18, 1997, the arbitrator resolved a few lingering disputes over the contract language and directed the parties to execute and file the final agreement. As luck would have it, that was the same day the Eighth Circuit issued its decision on the merits in *Iowa Utilities.* The PUC withdrew its order and, after supplemental briefing, directed the parties to modify the contract to comply with the Eighth Circuit's decision. On October 3, 1997, the PUC approved the revised agreement. On October 14, 1997, the Eighth Circuit clarified its prior decision and order in response to a petition for rehearing. *Iowa Utilities,* 120 F.3d 753.

On November 26, 1997, MCI asked this court to review certain disputed portions of the Agreement. On January 7, 1998, GTE asked the PUC to amend the Agreement to comply with the Eighth Circuit's October 14th decision. On January 13, 1998, GTE filed counterclaims and cross-claims asking this court to review disputed portions of the Agreement.

On January 26, 1998, the Supreme Court granted *certiorari* to review portions of the Eighth Circuit's decision. On November 13, 1998, the PUC granted (in part) GTE's request to amend the Agreement to comply with the Eighth Circuit's October 14th decision.

On January 25, 1999, shortly before oral argument in this case, the Supreme Court issued its decision in *AT & T,* —— U.S. ——, 119 S.Ct. 721. The Supreme Court reversed the Eighth Circuit's decision regarding jurisdiction and held that the FCC did have jurisdiction to promulgate the regulations in question. It remanded that case to the Eighth Circuit to consider various challenges to the merits of those regulations. The Supreme Court affirmed several other regulations on the merits, while vacating at least one (and probably two) additional regulations. This court must now determine how the Supreme Court's decision affects the instant case and, in particular, how it affects the interconnection agreement that was approved by the PUC and signed by the parties more than a year before the Supreme Court issued its decision.

To the extent the Supreme Court simply explained what the Act or the FCC's implementing regulations mean, this court must apply that interpretation when reviewing the challenged provisions in the MCI–GTE interconnection Agreement. When a federal court interprets a law—whether it be a statute, a regulation, the common law, or the Constitution itself—the court is not creating new law but merely declaring what that law has always meant, even if this interpretation had not previously been acknowledged or conflicts with an earlier interpretation. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 312–13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction"); *Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 107, 113 S.Ct.

2510, 125 L.Ed.2d 74 (1993) (Scalia, J., concurring) (when overruling prior precedent a judge does "not pretend to make a new law, but to vindicate the old one from misrepresentation").

The regulations that had been vacated by the Eighth Circuit are a different matter, however. The Eighth Circuit stayed those regulations (with limited exceptions) before they ever went into effect, postponing their effective date. *See Iowa Utilities,* 96 F.3d at 1118 (staying "effective date"). *See also* 5 U.S.C. § 705 (expressly authorizing reviewing court to "postpone the effective date of an agency action … pending conclusion of the review proceedings"). Ultimately, the Eighth Circuit vacated the regulations. The term "vacate" means "to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside." *Action on Smoking & Health v. Civil Aeronautics Board,* 713 F.2d 795, 797 (D.C.Cir. 1983).

As the PUC acknowledges, "[t]he upshot is that [these] regulations were not effective at the time the interconnection agreement at issue was crafted." As of this writing, it is unclear whether the Eighth Circuit will stay those regulations anew while it considers various challenges to the merits of those rules.

Even if the Eighth Circuit does not extend the stay, MCI nevertheless is asking this court to overturn portions of the MCI–GTE interconnection Agreement on the ground that the PUC failed to apply substantive regulations that were not in effect when the Agreement was approved by the PUC and signed by the parties. The court declines that invitation.

The FCC regulations in question go beyond merely interpreting the statute. They *create new legal obligations that have the force of law in their own right.* The court perceives a crucial distinction between applying a new interpretation of a law that admittedly was in effect during the relevant time period, versus applying a substantive regulation that never was in effect to begin with. *Cf. Rivers,* 511 U.S. at 311, 114 S.Ct. 1510 (declining to apply new legislative enactment retroactively and reiterating general principle that statutes operate only prospectively); *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208–09, 215, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (refusing to apply substantive regulations retroactively).

MCI essentially is asking this court to treat the stay, and the Eighth Circuit's subsequent order vacating the FCC regulations, as if those events had never occurred and the FCC regulations were continuously in effect. MCI has not cited a single case that suggests this court has the power to do this, or that it should exercise that power in this circumstance.

■ In an effort to bring this case within the ambit of the *Harper* retroactivity rule, MCI argues that the Supreme Court was interpreting a statute when it determined that the FCC had jurisdiction to issue these rules, hence the FCC always did have jurisdiction. It is a clever argument, but to no avail. The question is not whether the Eighth Circuit was correct in holding that the FCC lacked jurisdiction, but whether the Eighth Circuit's orders staying and subsequently vacating those regulations were effective. Reversal of the orders on the merits does not negate the fact that they were valid, effective orders.[3]

MCI's argument can carry the day only if the orders issued by the Eighth Circuit were void *ab initio,* which they clearly were not. Even though the Eighth Circuit was ultimately reversed on the merits, MCI has not suggested that the Eighth Circuit lacked authority to issue the stay delaying the effective date of the regula-

---

**3.** Thus, it is well established that a person can be held in contempt of court for violating a court order that was subsequently reversed. *See Walker v. City of Birmingham,* 388 U.S. 307, 313–14, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). The question is not whether the court's order was justified on the merits but whether the court had jurisdiction to issue it.

tions. *See* 5 U.S.C. § 705. A stay would be a hazardous procedural device if liability could be premised upon violating a rule while it had been vacated or stayed.[4]

■ Furthermore, a prerequisite to application of the *Harper* retroactivity rule is that the case announcing the new rule has itself applied that rule to the litigants in that case. *See Harper*, 509 U.S. at 97, 113 S.Ct. 2510 ("When this Court applies a rule of federal law to the parties before it ..."). *See also Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995) ("when (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as 'retroactive' "). In that circumstance, fairness requires that other similarly situated litigants receive equal treatment, not just the litigant whose case happened to be the one in which the rule was first announced. *See James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 538, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (plurality opinion); *Griffith v. Kentucky*, 479 U.S. 314, 323, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

That prerequisite is not present here. The Supreme Court did not announce a new rule of law and apply it to a particular interconnection agreement, which arguably might entitle other litigants to seek equal treatment. Instead, the Court ruled upon an abstract facial challenge to the FCC's jurisdiction to promulgate these regulations, and did not apply any of those regulations to a specific interconnection agreement. Nor, on remand, will the Eighth Circuit apply these regulations to any particular interconnection agreement. The litigants in the case decided by the Supreme Court will be treated no differently than the litigants in any other pending case raising the same issues.

This court's decision whether to give retroactive effect to the reinstated FCC regulations, in the context of the MCI–GTE Agreement, will likely be dispositive of a similar issue in five other interconnection cases pending before this court. For that reason, the court has reviewed the 19 supplemental briefs on this issue that were filed by the parties in those other cases. None of the authorities cited is on point.

*Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir.1993), and *Pennzoil Co. v. United States Dept's of Energy*, 680 F.2d 156 (Temp.Emer.Ct.App.1982), each concerned an agency's interpretation of its own existing regulations. The agency was not changing the law but stating what, in the agency's opinion, the law had always meant. In *Appalachian States Low–Level Radioactive Waste Comm'n v. O'Leary*, 93 F.3d 103, 113 (3d Cir.1996), the rule at issue was not a substantive regulation but an interpretive rule expressing the agency's view of what the statute meant. *Id.* at 112–13. Here, by contrast, the FCC was imposing new substantive requirements, which is why the effective date of the regulations matters.

*Thorpe v. Durham Housing Authority*, 393 U.S. 268, 282, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), is inapposite as well. At issue was whether a public housing authority must inform a tenant of the reasons why she is being evicted. While the action was pending, a new regulation went into effect which specifically required such notice. Since the tenant had not yet been evicted, the Court instructed the defendant to comply with the regulation and give her notice, thereby avoiding the need to decide whether such notice is mandated by the Constitution. That is an entirely different situation than the one presented here. To the extent *Thorpe* implies that regulations routinely are applied retroactively, that dictum has been severely limited by subse-

---

4. Although liability is not implicated in this case, the court sees no reason why the rule should apply only in such instances. Consider, for instance, a court order enjoining a person from assuming the post of mayor of a

city. If that order is later overturned, would all acts by the person while the order was in effect now be deemed to have been the acts of the mayor of the city?

quent decisions. *See, e.g., Georgetown Univ. Hosp.*, 488 U.S. at 208–09, 215, 109 S.Ct. 468. *Thorpe* also suggests that courts must always apply the law as it presently exists, but that is an oversimplification.[5] *Cf. Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (provisions of Civil Rights Act of 1991 did not apply to pending cases premised on events occurring before the effective date of the Act).[6]

The cases cited by Sprint are somewhat closer to the mark, but distinguishable nevertheless. In each of those cases, the Ninth Circuit held that the Sentencing Guidelines were applicable to crimes committed, pleas entered, or sentences imposed during the period between the Ninth Circuit's decision holding the Sentencing Reform Act ("SRA") unconstitutional, and the Supreme Court's reversal of that decision. *See, e.g., United States v. Kincaid*, 898 F.2d 110, 111 (9th Cir.1990); *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1053 (9th Cir.1990); *United States v. Kane*, 876 F.2d 734, 734–36 (9th Cir.1989).

In the SRA cases, the underlying conduct was always illegal, and a statutory penalty was in place, regardless of whether the SRA was constitutional. Here, by contrast, a contract that complied with all laws in effect at the time would retroactively be deemed to have violated a regulation that was not in force at the time.

Second, unlike the present case, the Ninth Circuit did not issue a nationwide stay postponing the effective date of the SRA, nor did that court vacate the statute. Rather, the SRA went into effect, and at all times remained on the books; the Ninth Circuit simply declined to apply the statute, believing it to be contrary to the

Constitution. By contrast, the regulations at issue here never went into effect. The Eighth Circuit first delayed their effective date for nearly a year, and then vacated them. That is a critical distinction.

The Supreme Court ultimately disagreed with the Ninth Circuit's determination that the SRA was unconstitutional, and concluded that the Circuit had erred by not applying the law in effect at the time. As with other cases in which a lower court has failed to apply the proper rule, the judgments were reversed and remanded for application of the correct rule. That is not the situation here. The PUC did not fail to apply the law that was in effect at the time; rather, it is accused of failing to apply regulations that were not in effect.

The procedural posture also is different. In the SRA cases, the Ninth Circuit was reviewing a direct appeal from a sentence imposed by the district court. By contrast, this court is reviewing the terms of a contract approved by an administrative agency.

Finally, the Supreme Court's decision affirming the constitutionality of the SRA applied the rule announced in that case to specific individuals, affecting their sentences. Thus, the *Harper* prerequisite (that the rule has actually been applied to the parties before the Court) was satisfied there, which also distinguishes the SRA cases from the one at hand.

The bottom line is that—despite this court's request for briefing on the issue—the combined forces of MCI, AT & T, Sprint, WorldCom, and the FCC have failed to cite a single case on point to support their contention that portions of

---

**5.** If that were really the rule, judgments would be subject to reversal each time the rules of evidence are amended.

**6.** *Cf. Twin Pines Coal Co. v. United States Dep't. of Labor*, 854 F.2d 1212, 1216 (10th Cir.1988) (applying agency regulations in effect when claimant applied for benefits, not replacement regulations that took effect 18 months later); *Schlett v. Avco Financial Ser-*

*vices*, 950 F.Supp. 823, 835 (N.D.Ohio 1996) (refusing to apply regulation that took effect after events at issue but while action was pending); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F.Supp. 211, 218 (D.Me.1996) (applying regulations in effect at time of incident that gave rise to action, rather than revised regulations that took effect while action was pending); *Gregor v. Derwinski*, 911 F.Supp. 643 (W.D.N.Y.1996) (same).

the Agreement must be overturned because the PUC failed to apply certain FCC regulations to an Agreement that was entered into more than a year before those regulations took effect.

A final consideration is that the challenged interconnection agreement has only a two year term and will expire seven months from now. If this court were to remand the entire Agreement (or even large portions of it) to the PUC to begin the process anew, this time applying an entirely new set of rules, there is little doubt that the Agreement would expire and this case would be moot before the PUC could complete its task. The net result would be a significant expenditure of resources by all involved, with very little to show for it in terms of opening local telephone markets to competition. Oregon is not alone in this dilemma. The court is informed that there are numerous similarly situated interconnection agreements around the country, of short duration, many of which undoubtedly would expire before they could be revised to comply with the new FCC rules.

The only practical course in this circumstance is to generally limit this court's review of the existing Agreement to a determination of whether any challenged provision violates the statutes and regulations in effect at the time this Agreement was approved by the PUC, excepting any regulations that have since been declared void. The Supreme Court's interpretation of the relevant statutes and regulations is, of course, controlling.

The parties will apply the reinstated FCC regulations—assuming they are not again stayed, or vacated on the merits—in negotiating the replacement contract that takes effect later this year.

## 2. *GTE's Motion for a Stay*

GTE has moved to stay these proceedings until (1) the Eighth Circuit completes its review of the merits of the challenged regulations, and (2) the FCC promulgates new rules to replace those vacated by the

Supreme Court. The court denies the motion.

## *DISCUSSION OF THE MERITS*

### 1. *Price for Network Elements*

GTE challenges the interim prices established for unbundled network elements, which were based on the results of the UM 351 proceeding.

### A. Reliance Upon UM 351 Proceeding

The PUC began studying unbundled element prices in 1990, six years before the Act was enacted. GTE actively participated in those earlier proceedings, known as UM 351. When Congress enacted the Act in 1996, it established very short timelines for the adoption of interconnection agreements and the establishment of unbundled element prices. The arbitrator understandably chose to rely heavily upon the extensive administrative record and analysis that already existed, instead of beginning the process anew.

#### i. Due Process of Law

Reliance on those earlier proceedings did not deny GTE due process of law. The PUC did not apply principles of collateral estoppel to preclude GTE from contesting the element prices. Rather, the earlier proceedings were treated as evidence that could be considered in the subsequent proceeding, and which the arbitrator and the PUC ultimately found were the most reliable evidence then available. GTE was free to introduce contrary evidence and to urge a different result.

#### ii. Prejudgment of Outcome

Contrary to the allegations in GTE's briefs, the arbitrator did not prejudge the results. Rather, during a conference with the parties to discuss how the case would proceed, the arbitrator advised the parties that "at this point" he intended to use the results of the UM 351 proceeding to set the element prices in this Agreement, but the parties could also "submit other costs studies for consideration." The arbitrator merely did what many judges would have

done in that situation, when confronted with a complex case and short deadlines, which was to share his tentative thoughts on how to proceed while still leaving the door open for the parties to persuade him to follow a different course. While the arbitrator's language might have been chosen more carefully, the court concludes that the arbitrator did not prejudge the outcome of the proceeding. Moreover, as a practical matter, GTE has not pointed to any realistic alternatives to the path identified by the arbitrator.

### iii. Extra–Record Evidence

The arbitrator did not err by taking administrative notice of the record established in the UM 351 proceeding, in which GTE was an active participant. The Act does not require the PUC to ignore the information already in its files, or its extensive expertise and experience in overseeing telephone pricing and service in Oregon, and its knowledge of pricing, costs, and related issues.

### iv. Exceeding Authority

GTE contends that the PUC and the arbitrator exceeded their authority by adopting the element prices established in the UM 351 proceeding, because neither MCI nor GTE urged that result. The court disagrees. Although neither party urged adoption of the UM 351 prices, the question of "element prices" was properly before the PUC. The parties did not agree on a price list.

The PUC was not limited to selecting the prices or terms proposed by one of the parties. If the PUC determines that neither side's proposal on a particular issue is appropriate, the PUC is not required to select one of the two positions anyway. In this circumstance, the PUC could properly reject both proposals and fashion terms that, in the PUC's judgment, comport with the legal requirements and the public interest.

### B. Reliance Upon U.S. West Cost Data

The parties agree that the UM 351 proceeding was based on U.S. West's cost data, not GTE's. GTE contends the Act requires that element prices be based upon its costs, not those of some other company.

### i. Consent

■ The PUC contends that GTE waived any objections by consenting to the use of U.S. West's data in the UM 351 proceeding. The court disagrees. The UM 351 proceeding began in 1990 as an early attempt to identify the costs of various network elements, with the idea that this data might be useful in setting retail rates and experimenting with local competition. In 1993, the PUC suggested that the UM 351 proceeding focus on U.S. West's cost data, in large part because the PUC did not have the resources to analyze data from the other carriers. GTE agreed to that proposal. However, GTE could not have known at the time that the results of the UM 351 proceeding would be used to set prices for GTE's network elements under a law that was not enacted until three years later. Nor, given the court's understanding of the limited purposes originally envisioned, is it proper to estop GTE from contesting the PUC's decision to base GTE's prices on U.S. West's costs.

### ii. Mootness

MCI contends that the issue is moot because, under the FCC pricing regulations, network element prices are based solely upon the costs that theoretically would be incurred by a mythical network that exists only in economic models. GTE's actual costs, network architecture, and similar details would therefore be irrelevant. MCI's description of the FCC pricing regulations is less than reassuring. However, the court need not address that question today because the FCC pricing regulations were not in effect when this Agreement was approved, and therefore were not binding upon the PUC.

### iii. Best Available Information

■ The PUC defends its use of the UM 351 prices, even though based on U.S.

West's cost data rather than GTE's, on grounds (1) this was the best information available at the time, (2) GTE has not demonstrated that its own costs are materially higher, and (3) this was only an interim price until the PUC could review GTE-specific cost studies.

The court concludes that under the circumstances presented here, the PUC's decision was not arbitrary and capricious or contrary to law. The Act established aggressive timetables for approval of interconnection agreements. The PUC reasonably concluded that it should use the existing UM 351 study, on an interim basis, until it could evaluate new cost studies and fix "permanent" prices specific to each carrier. The PUC has since adjusted U.S. West's element prices based upon the UM 773 and UM 844 proceedings, and has begun a similar GTE-specific proceeding (which is designated UM 874).

GTE contends the PUC had a viable alternative, which was to use the cost studies that GTE submitted. However, the PUC discounted those studies because it disagreed with the underlying methodology utilized by GTE. That decision was not arbitrary and capricious. Nor, as GTE contends, was the PUC obliged to adopt GTE's flawed cost studies merely because MCI did not file a competing cost study.

GTE also contends that the PUC violated § 252(b)(4)(B) by relying on U.S. West's costs and the UM 351 proceeding. GTE asserts that the PUC may rely upon the "best information available to it" only if GTE "refuses or fails unreasonably to respond on a timely basis to any reasonable request from the" PUC. *Id.* In GTE's view, the PUC should have asked GTE to submit additional cost studies or perhaps used portions of the studies that GTE did submit, while rejecting or modifying other portions of those studies.

GTE's proposed solution does not consider the statutory deadlines that the PUC was operating under. There was not sufficient time remaining for GTE to prepare and present new studies, and for the PUC to properly analyze those studies. In that circumstance, the data was constructively unavailable. In addition, since the cost studies GTE submitted did not comply with the PUC's proposed methodology, the PUC could properly have concluded that GTE had refused, or failed unreasonably to respond on a timely basis, to a reasonable request from the PUC. Consequently, the PUC was not precluded from utilizing the best information available to it at the time. Nor was the PUC required to dissect GTE's cost studies, picking out the parts (if any) that either did comply with the PUC's methodology or perhaps could be modified to comply. While the PUC was not precluded from attempting such a task if it was so inclined, it was not compelled to do so under the circumstances presented here.

### C. Challenges to Pricing Methodology

GTE challenges the pricing methodology utilized by the PUC, which GTE contends does not fairly compensate it for the cost of providing network elements. GTE complains that the PUC's methodology focuses upon the hypothetical costs of a mythical network that does not exist, while ignoring the actual costs to GTE of providing these elements. GTE also complains that the PUC's emphasis on "forward-looking costs" improperly denies it compensation for the sizable investment GTE has already made in its existing infrastructure, which the PUC historically has not let GTE recover quickly because the PUC wanted to keep telephone rates low. GTE contends there was a commitment that GTE would eventually be permitted to recover those costs, which has now been broken.[7]

---

7. There are other concerns regarding this pricing methodology. For instance, from the details provided to the court, it appears that costs are based upon a mythical efficient competitor who does everything right the first time. The real world is not like that. The Telecommunications Act did not repeal Murphy's law.

Despite some misgivings about the methodology used by the PUC, the court does not believe it is appropriate to decide the validity of that methodology today. Very similar issues are pending before the Eighth Circuit in a consolidated nationwide proceeding that challenges the substance of the FCC's pricing regulations. The Eighth Circuit's decision will supersede any ruling this court might make regarding this issue. In addition, at oral argument the parties confirmed that their Agreement does not contain a "true-up" clause, and agreed that even if this court determines that the PUC's pricing methodology was flawed, MCI has no obligation to compensate GTE retroactively for the difference between the old and new prices on services that have already been sold. Finally, even if this court set aside the PUC's pricing methodology, the court cannot simply pick numbers out of the air to replace the existing element prices. Rather, the court would have to remand the Agreement to the PUC to devise a replacement methodology and to compute new element prices. In all likelihood, before the PUC could complete that task, the present Agreement will have expired and the Eighth Circuit will have ruled on the challenge to the FCC pricing rules.

At oral argument, GTE proposed to stay this issue pending the Eighth Circuit's decision, but that would unduly complicate any appeal from the final judgment entered in this action. Instead, the court will dismiss, without prejudice, that portion of GTE's case that specifically challenges the PUC's unbundled network element pricing methodology. This includes ¶ 162 of Count I(B), and Count I(D), of GTE's Amended Counterclaims and Cross–Claims.

### D. State Law Claims

GTE also asserted several claims alleging that the PUC violated state law during the UM 351 proceeding. GTE later moved to dismiss those claims, without prejudice, because they are simultaneously being asserted in a state court challenge to the UM 351 proceeding.

Initially, the court was inclined to deny the motion to dismiss because it believed the decision in the present case would, as a practical matter, be dispositive of the state law claims. For instance, if there was substantial evidence in the record to support the decision for purposes of federal law, then in all likelihood the equivalent state law standards also were satisfied. In addition, the Act gives the federal district courts exclusive jurisdiction to review any challenge to an interconnection agreement. § 252(e)(4) and (e)(6).

During oral argument, however, the parties represented that the UM 351 proceeding includes a number of additional matters not at issue here that have independent significance apart from this case, and the state court could entertain and decide those matters without collaterally attacking the judgment entered in the present case. In addition, some of the plaintiffs in the state court case are not parties to the instant proceeding. Finally, it is preferable to let the Oregon courts decide important or novel questions of state law, particularly in areas of pervasive state regulation such as with public utilities. The court therefore grants GTE's motion to dismiss, without prejudice, Counts VI, VII, and VIII of GTE's Amended Counterclaims and Cross–Claims. GTE's alternative motion to file an amended pleading is denied as moot.

### 2. *Takings*

During oral argument, GTE clarified that it is not directly asserting a takings claim. It does contend that the Act must be construed in a manner that avoids a taking and that GTE must be fully compensated for any taking that occurs, which includes just compensation for the elements and services it is required to sell to MCI.

In response, MCI and the PUC assert that the Fifth Amendment does not require that GTE be fully compensated for each unbundled element or other service it must sell to MCI, so long as GTE's finan-

cial integrity as a whole is not impaired. They rely upon the "total effect" test articulated in *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 312, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944). This court previously questioned that argument, *U S West Communications, Inc. v. MFS Intelenet, Inc.,* 35 F.Supp.2d 1221, 1236 (D.Or.1998), and remains skeptical here.

*Duquesne* and *Hope Natural Gas* applied the "total effect" test in the context of regulated monopolies, in which losses in one area could be offset by altering the rates in another. That may no longer be possible once the market for local telephone service is opened to competition. If GTE is forced to sell unbundled network elements or finished services at below cost to MCI, the PUC cannot simply compensate GTE by raising retail prices for other telephone services, because competitors could then under-price GTE. Moreover, with deaveraging of retail prices on the horizon, the PUC may soon have little control over the retail prices charged for telephone service, nor will it be able to guarantee GTE a particular rate of return.

In addition, MCI has vehemently denounced implicit subsidies, by which one service is overpriced to subsidize another, insisting that such subsidies violate the Act. MCI cannot now be heard to argue in favor of such an implicit subsidy so MCI can avoid paying full compensation for the services it purchases from GTE.

Finally, the Act expressly requires that network element prices be based upon cost, and that GTE otherwise receive just and reasonable compensation for the services it provides to MCI and for any other takings effected by the Act. The Act does not say that GTE's other customers must pick up the tab.[8]

■ For purposes of this case, there is no need to conclusively determine whether the "total effect" test continues to have any applicability to local telephone service, or whether GTE could prevail on a takings claim if the challenged prices in the interconnection Agreement denied GTE adequate compensation. Suffice it to say that this court construes the Act to require that just and reasonable compensation be paid for the services GTE provides to MCI, and—except as specifically contemplated in the Act, *see* fn 8, *supra*—the PUC may not underprice those services in hopes that revenue from other customers or products will make up for the shortfall.

### 3. *Deaveraging:*

■ MCI contends the PUC erred by establishing a single state-wide interim loop price, instead of "deaveraging" those prices into multiple zones (based on density or some other criteria) and charging a different price for each zone. The net effect of MCI's proposal would be to reduce loop prices in dense urban areas, while significantly increasing loop prices in the rest of Oregon.

This court declined to order immediate deaveraging in two prior decisions. *MCI Telecom. Corp. v. U.S. West Communications, Inc.,* 31 F.Supp.2d 859, 860–61 (D.Or.1998); *AT&T Communications of Pac. Northwest, Inc. v. U S West Communications, Inc.,* 31 F.Supp.2d 861, 865 (D.Or.1998). This court concluded that averaged loop prices are cost-based. The PUC simply chose to set a single loop price based upon the average cost of providing service rather than separately calculating the costs attributable to a particu-

---

**8.** Of course, to the extent that retail prices for business service currently subsidize the price of residential service, the court does not mean to imply that GTE can ignore that subsidy and charge MCI a higher resale price for residential service. The resale provisions in the Act are based on actual retail prices, § 252(d)(3), even though under the present rate structure those prices may be subsidized. The court also does not suggest that explicit universal service subsidies cannot affect the compensation paid to GTE for its services. That will depend upon how the particular subsidies are structured.

lar loop and pricing each loop accordingly. *MCI Telecommunications Corp. v. U.S. West,* 31 F.Supp.2d at 860. The court also noted that "[t]he PUC has not refused to deaverage loop prices, but wants to do it in an orderly fashion" and planned to address deaveraging in a separate proceeding. *Id.* Finally, the court acknowledged concerns, voiced by both U.S. West and the PUC, that the deaveraging of loop prices needs to be coordinated with the deaveraging of retail prices for those services and the implementation of explicit universal service programs, which was lagging. Unlike CLECs such as MCI, an ILEC is legally obligated to service all customers within its territory, at the same fixed price. Consequently, MCI and other CLECs could solicit the most profitable customers, leaving the ILEC to service the unprofitable accounts the CLECs do not want.[9] *Id.* at 860–61.

The reasoning expressed in the earlier cases is equally applicable here. Nothing has changed during the intervening three months to convince this court to reverse its position.

MCI argues that an FCC regulation, 47 C.F.R. § 51.507(f), now mandates deaveraging into at least 3 zones. However, for the reasons discussed earlier, this court concludes that § 51.507(f) was not in effect during the time this Agreement was adopted and the loop prices were established, hence the PUC did not have to follow that regulation. Deaveraging into at least three zones is not a requirement imposed directly by the Act, which would have to be given retroactive effect. The Act does not even mention deaveraging, let alone require a minimum of three zones. Rather, this requirement is a creation of the FCC, issued pursuant to its general regulatory powers. *See AT & T,* —— U.S. at ——–——, 119 S.Ct. at 729–33. Whether the FCC has the authority to

require deaveraging will be decided by the Eighth Circuit. Even assuming the regulation is affirmed, the PUC is not required to retroactively apply that regulation to interconnection agreements that were approved before the regulation took effect.

MCI also argues that when approving this particular Agreement—and unlike some other interconnection agreements this court has reviewed—the PUC deleted the arbitrator's discussion of universal service and related considerations, and said the reason it was not deaveraging loop prices was because it lacked sufficient information to do so. Accordingly, MCI contends the court should focus solely on that justification.

MCI says it provided the arbitrator with calculations that would have established six different loop prices, and contends this information was enough to implement deaveraging. However, MCI concedes that when the arbitrator began to review those calculations, he quickly realized that at least some of the calculations could not possibly be correct. MCI's witness acknowledged the problem, and suggested it was likely a mathematical error that could be corrected, a position MCI asserts in this proceeding. Perhaps it was. However, the record excerpts reviewed by the court indicate that this document was furnished at the last minute to the parties and the arbitrator, and there had been little opportunity to verify the underlying assumptions and calculations. Upon discovering a glaring error in some critical calculations, the arbitrator understandably lost confidence in MCI's data and was unwilling to adopt it on faith without a chance to thoroughly analyze the data and the assumptions behind it. That decision was not arbitrary and capricious.

**9.** If MCI intended to serve a full range of customers through unbundled loops, it likely would not be arguing so strenuously for deaveraging loop prices. Deaveraging makes financial sense to MCI only if it intends to target primarily the lowest-cost loops, while

either (1) leaving the higher-cost loops for GTE to service, or (2) serving those higher-cost customers via the resale route, where the discounted price the CLEC pays to GTE may be less than GTE's actual cost to provide the service.

1172

The court also observes that the Oregon PUC was aggressively moving toward implementing unbundled elements and local competition long before Congress passed the Act. This is not a case where the PUC had to be forced into embracing local competition. Accordingly, when the Oregon PUC concludes that deaveraging in Oregon is premature, or it does not have the information it needs to implement deaveraging in an orderly manner, this court is inclined to give considerable deference to the PUC's opinion.

**4. Wholesale Discounts**

The arbitrator fixed the interim wholesale discount at 15.95 percent, as proposed by MCI. However, the arbitrator made an exception for services already subject to a volume or term discount, for which he awarded MCI only one-half the wholesale discount (in addition to the volume or term discount). MCI and GTE each challenge portions of the decision.

**A. Volume and Term Discounts**

■ MCI contends it is entitled to receive the full wholesale discount *in addition to* the full volume or term discount. The court disagrees. In all likelihood, the existing volume or term discount already takes into account some of the cost savings that could reasonably be achieved from selling the product at wholesale (*e.g.*, billing, marketing, etc.). MCI is not entitled to deduct the same cost savings twice. While there may be room for some additional savings, it is unlikely to be the full 15.95 percent. *AT&T v. U S West*, 31 F.Supp.2d at 863. The arbitrator therefore applied a lower wholesale discount rate in this situation.

The PUC's decision to allow one-half the regular wholesale discount, in addition to the volume or term discount, is a reasonable interim compromise. However, the PUC must expeditiously complete any studies or hearings needed to identify the additional costs savings that should reasonably result, and adjust the wholesale discount on these services accordingly. *Id.*

**B. Retail–Exit Methodology**

GTE challenges the methodology that the PUC used to compute the wholesale discount. 47 U.S.C. § 252(d)(3) provides, in relevant part, that:

[A] State commission shall determine wholesale rates on the basis of retail rates charges (sic) to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.

To implement this section, the PUC asked what costs GTE would avoid if it abandoned the retail business entirely, and then assumed that 100 percent of those costs were avoidable for purposes of calculating the wholesale price. This is commonly referred to as the "retail-exit" methodology, which the PUC borrowed from the FCC.

GTE protests that it is not leaving the retail business, and therefore cannot reasonably avoid all of the costs that the retail-exit method presumes are avoidable. Many of those costs are fixed. If Sam Customer transfers his residential service to MCI, which purchases it from GTE at a wholesale discount, the half-page advertisement that GTE runs in the local newspaper every Sunday won't cost any less now that Sam is an MCI resale customer. The advertising agency and artist that created the ad are unlikely to reduce their fees either.

GTE will save the cost of the stamp to mail Sam his monthly bill, but the cost to design the software program to track the charges to Sam's account and to print his bill should not vary much. The cost of the machines to print bills, and to open envelopes, is unlikely to change dramatically either. Nor, unless a large number of customers abandon GTE for MCI, will there be a significant reduction in personnel, support staff (such as human resources), or office space requirements.

GTE also questions the PUC's assumption that retail costs will decrease in a

"straight-line," a fixed amount for each wholesale unit. More likely, many of the cost savings will be "lumpy." For instance, if GTE needs one envelope-opening machine for each 50,000 retail customers, then a reduction of 50 or even 500 retail customers will have no impact on the number of machines it needs. The cost savings will accrue only when that critical mass is reached, if it ever is, and will accrue in "lumps" rather than on a straight-line basis.

MCI offers several responses to GTE's criticisms. First, it contends that the retail exit methodology is required by binding FCC regulations. However, those regulations were not in effect when the PUC adopted this agreement and set the wholesale prices, and therefore are not controlling here.[10]

Second, MCI argues that GTE's actual cost savings are irrelevant. Instead, the focus should be on what someone in the wholesale business would charge for these services.

Finally, MCI argues that the retail-exit and straight-line methodologies are neces-sary to prevent GTE from using the wholesale prices to subsidize its retail business. For instance, while GTE will continue to pay the same price for its display ad in the newspaper, MCI argues that unless the cost of that advertisement is deducted from the wholesale price, MCI will be helping to pay for the cost of that advertisement, from which it derives no benefit.[11] Consequently, when setting the wholesale price, MCI believes the PUC should consider only the advertising, billing, collection, and similar costs that GTE directly incurs in order to provide the particular unit of service that is being sold to MCI, without regard to whether GTE's operations (when viewed as a whole) actually realize any reduction in cost. Otherwise, the wholesale discount might not be enough for MCI to earn a profit reselling GTE services.

At oral argument, the parties suggested deferring this issue until the Eighth Circuit rules on the challenges to the FCC wholesale pricing regulations. The court reluctantly concurs. The PUC's methodology appears to be the same as the FCC's

10. During oral argument, MCI asserted that the PUC was compelled to follow the retail-exit methodology because the FCC blessed that method in a few paragraphs of a massive document entitled *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996. First Report and Order,* FCC No. 96–325, 11 FCCRcd. 15499 (Aug. 8, 1996). The court disagrees.

That Report contains hundreds of pages of discussion, at the end of which the FCC lists dozens of "final rules." The "final rules" set out in Appendix B to the Report are substantive regulations with the force of law. However, the nearly 700 pages of discussion leading up to those rules are a mix of commentary and interpretation, in which the FCC articulates its vision of the Act and the justification for the final rules it is adopting.

Those portions of the First Report and Order that were not reduced to a "final rule" are best regarded as commentary, policy statements, or interpretive rules (at least from the perspective of state PUCs reviewing interconnection agreements). Those passages provide important insights into the FCC's interpretation of the Act and of its own regulations, and often will be entitled to considerable deference, but they are not substantive regulations with the force of law which this court must blindly follow.

The court declines MCI's invitation to treat the entire 700 page report, and its 3,277 footnotes, as a binding substantive rule, or to parse that document line by line in search of substantive rules. If the entire report were intended to be a substantive rule, there would have been no reason to separately promulgate regulations, as the FCC did. Moreover, Congress clearly contemplated that the FCC would promulgate formal "regulations." *See* 47 U.S.C. § 252(e)(2)(B).

It would be particularly inappropriate to rely upon passages in the First Report and Order as a binding rule when the formal regulations to which those passages refer were themselves stayed and later vacated by the Eighth Circuit and therefore were not applicable to this Agreement.

11. Of course, even when GTE runs its own advertising to promote a particular product (*e.g.,* caller-ID), MCI derives some benefit if the advertising creates a demand for that product, which the customer can then order from MCI.

methodology. Therefore, the Eighth Circuit's decision will, as a practical matter, supersede any ruling by this court on the issue.

As with the TSLRIC issue, the court will dismiss, without prejudice, the portion of Count I(A) of GTE's Amended Counterclaim and Cross–Claims that challenges the methodology used by the PUC to compute the wholesale discount (excepting those issues specifically addressed below).

### C. Unitary Discount

GTE also challenges the PUC's decision to set a single discount price for all telephone services made available for resale (except for volume and term discounted services), notwithstanding that there may be a wide variation in the cost savings to GTE for different services, and MCI is not required to purchase all of its services from GTE.

GTE's concern is illustrated by analogy to a store owner who sells two kinds of candy bars. Bar–A should retail for 25 cents, while Bar–B should retail for 45 cents. To simplify matters, he decides to price both bars at 35 cents. That plan works only if he sells at least as many units of Bar–A as he does of Bar–B. It does not work if customers purchase only Bar–B at his store, while purchasing Bar–A from a competing store that continues to price it at just 25 cents.

With local telephone service, it is generally acknowledged that the ILEC's potential cost savings from resale may be lower for some services (*e.g.*, basic residential service) than for others (business, vertical features). If a unitary discount is utilized for all services, the net effect might be to artificially increase the wholesale discount for residential services while decreasing the wholesale discount for some other services. That is not a problem if MCI has to purchase all of its services under the same plan, but it does not. MCI can selectively

purchase residential services at the resale price (and receive the benefit of the higher wholesale discount) while buying business and vertical features at the unbundled element price. If the actual difference in cost savings between the various products is substantial, then GTE is effectively in the position of the shopkeeper selling 45 cent candy bars for 35 cents. That would not be just and reasonable compensation, and it would be a violation of 47 U.S.C. § 252(d)(3).

The PUC understandably was reluctant to complicate matters by setting too many discount rates. The court agrees with that basic premise, and is not suggesting that there must be a separate discount rate for each service GTE offers. However, in setting the discount rate(s), the PUC must consider the range of cost savings for different categories of services, as well as the potential for abuse through selective ordering tactics, and determine whether more than one rate is needed. The PUC did not give sufficient consideration to this issue or to all relevant factors, and placed undue emphasis on a single factor (simplicity). Therefore, the court remands the wholesale discount issue for reconsideration.[12] In view of the pending Eighth Circuit challenge to other aspects of the FCC's wholesale pricing regulations, the PUC may exercise its discretion in deciding what additional studies or proceedings to undertake at this time in furtherance of this remand.

### D. Costs of Wholesaling

GTE contends that in computing cost savings for purposes of the resale discount, the PUC must take into account the new costs that GTE will incur as a wholesaler. The court agrees. For instance, although GTE will no longer have to bill and collect from these particular retail customers, it will now have to bill and collect from an assortment of CLECs. GTE may no longer have to be concerned

---

12. So there is no misunderstanding, the court is *not* ordering the PUC to establish multiple discount rates. That decision will depend in large part upon the conclusions the PUC reaches after analyzing the relevant data. In theory, at least, the PUC might find very little variation in the cost savings between services, though at the moment that seems unlikely.

about retail customers who skip town, but it now has to be concerned about CLECs who go bankrupt. Not all prospective CLECs are as credit-worthy as MCI and AT & T. MCI's contention that the PUC must focus only on the retail cost savings, while ignoring any offsetting increase in wholesale expenses, is equivalent to balancing a savings account by counting the deposits but not the withdrawals.

The PUC responds that it did make an offset for such expenses by discounting only 90 percent of certain retailing cost categories instead of 100 percent. However, it is not clear whether 100 percent of those costs would have been avoidable anyway, or how the PUC calculated the additional costs of selling services at wholesale. The court will remand this issue to the PUC for reconsideration and to articulate a clearer explanation of the reasons for the PUC's decision.

**E. Which Services are Subject to the Wholesale Discount**

47 U.S.C. § 251(c)(4)(A) requires GTE to "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers...." The parties do not agree on a list of "retail" services or even the definition.

The dispositive question ordinarily is not whether a particular customer is a "retail" customer but whether the particular service in question is one that GTE "provides at retail to subscribers who are not telecommunications carriers." That intent is evident from the language of the statute, and also from the use of retail prices as the starting point in computing a wholesale price. Most of the time there will be many retail customers for each service, a tariffed price, and little room for dispute. In a few circumstances, though, there may be only a handful of subscribers to that service, hence it will be necessary to look more closely at the specific customers involved.

At oral argument, the attorneys for the parties attempted (with limited success) to explain each of the services in question. The court's analysis of this issue is premised upon those explanations.

**i. Directory Assistance and Operator Services**

 If retail subscribers are typically charged a fee for using these services, then they qualify as "retail" services for purposes of § 252(d)(3). Whether GTE actually saves any costs by providing these services to MCI at wholesale is another question, but that is something the PUC must examine when it reconsiders its decision to establish a unitary discount rate.

**ii. Non–Recurring Costs**

These include a variety of one-time only charges incurred when retail service is established, resumed, or transferred. If the non-recurring charge is customarily billed to the subscriber, then it is a retail service, though the amount of any cost savings to GTE is something the PUC needs to consider in deciding what discount rate to apply. On the other hand, if it is a cost that ordinarily is absorbed by the carrier, as part of the general cost of providing service, then it is not a retail service and need not be discounted. However, the item potentially could qualify for treatment as an unbundled network element.

The parties failed to provide the court with sufficient information about the particular non-recurring costs at issue to issue a final ruling. By March 31, 1999, the parties shall advise the court which of the disputed non-recurring costs are retail services (and which are not) under the definition set forth above. If the parties are unable to agree, then the court will make that determination on the basis of the information the parties provide.[13]

**iii. Pay Phone Lines**

 The next disputed service is "public and semi-public pay phone services and

13. The parties shall also advise the court whether retail subscribers are charged a fee for using the directory assistance and opera- tor services discussed in the prior section of this opinion.

COCOT coin and coin-less lines." The parties defined these as lines that GTE sells to persons who install and operate pay telephones. GTE contends these are not retail subscribers but wholesalers because they resell the use of these lines to the public on a per-call basis. It is an interesting question, but the court ultimately is not persuaded by GTE's argument.

First, it does not appear that the FCC presently classifies pay phone providers as telecommunications carriers. Second, the line is not intended to be resold to retail customers, notwithstanding that numerous individuals may place calls on that phone. Finally, it is the court's understanding that anyone can install a pay phone in his deli (or teenager's bedroom), call GTE, and obtain a line for that phone at the generally applicable price. These are essentially retail customers. There are, of course, companies that operate numerous pay phones and purchase multiple lines from GTE, but that does not necessarily make them "telecommunications carriers" nor does it alter the fact that the service is one GTE makes available to retail customers. To the extent that customers who purchase multiple pay phone lines receive a volume discount from GTE, the wholesale discount may be lower, but GTE nevertheless must make these services available for resale to MCI.

### iv. Individual Case Basis ("ICB") Contracts

At oral argument, the parties surmised that these were probably contracts negotiated with very large business customers with specialized needs. It is unclear how many of these contracts exist, and the parties were vague about other details. It is not clear whether the contracts are for services generally available to the public, or for unique combinations of network elements designed for a particular client. Nor is it clear how these services are priced, or what costs GTE would save by wholesaling these services to MCI. To the extent the wholesale price would be premised on a contract between the customer and GTE, it also is unclear what will happen when the contract expires, or whether the customer is permitted to switch carriers prior to then.

The court is reluctant to decide this issue without an adequate factual foundation, which the parties have failed to provide. The agency's written decision provides little additional insight. By March 31, 1999, the parties shall file supplemental briefs or other materials providing a more detailed explanation of ICB contracts and addressing the issues identified above. The court will then decide this issue (if there is adequate information) or else remand to the PUC to articulate a clearer explanation of the issue and of the rationale for the PUC's decision.

### 5. *Availability of Unbundled Elements by Tariff*

The PUC ordered GTE to publish a tariff listing elements that the PUC has decided must be unbundled and the prices that the PUC has fixed for those elements. Although the briefing was not fully informative, it appears that prospective CLECs can order services "off-the-rack" without entering into an interconnection agreement. GTE labels this an "end-run" around the Act, and complains that it denies GTE the opportunity to negotiate different terms with each CLEC.[14] GTE asks

---

**14.** The court has jurisdiction over this claim, even though the tariff order is not part of the MCI–GTE interconnection agreement. Arguably, jurisdiction is conferred by 47 U.S.C. § 252(e)(6), which gives this court exclusive authority to review a "determination under this section" by a state PUC. If the PUC's order was premised on state law, the court also has jurisdiction under 28 U.S.C. § 1331 to hear GTE's claim that the order, or the state law on which it relies, is preempted by a federal statute. *See Hydrostorage, Inc. v. Northern Calif. Boilermakers Local Joint Apprent. Committee*, 891 F.2d 719, 725 (9th Cir. 1989). Finally, the court has supplemental jurisdiction under 28 U.S.C. § 1367(a), given the extent to which the facts and legal questions regarding this claim are intertwined

the court to declare that the PUC's tariff requirement is preempted by the Act and is therefore void pursuant to the Supremacy Clause of the United States Constitution.

The court rejects most of GTE's underlying premise. Nevertheless, the court concludes that the tariff, as presently structured, conflicts with the Act and is therefore preempted.

■ Generally speaking, the PUC is not precluded from setting unbundled element prices and wholesale discounts for a particular ILEC, and using those same prices and rates in all interconnection agreements involving that ILEC. The court rejects GTE's contention that GTE must be permitted to negotiate different prices with each CLEC.

This court previously questioned the PUC's decision to establish different wholesale discount rates for each CLEC. *US West Communications, Inc. v. AT & T Communications of the Pac. Northwest, Inc.*, 31 F.Supp.2d 839, 845–46 (D.Or.1998). GTE's cost savings should not differ markedly depending upon which CLEC is buying the services. Likewise, GTE's costs to produce a network element should not vary materially depending upon which CLEC is purchasing that element.

Several provisions in the Act reinforce this conclusion. An agreement under which GTE provides services at lower prices to its preferred CLECs might be deemed collusive and violate the non-discrimination requirement in 47 U.S.C. § 251(c)(4). In addition, once GTE provides an element or service pursuant to an interconnection agreement with one CLEC, GTE must make that element or service available to any other CLEC "upon the same terms and conditions." 47 U.S.C. § 252(i). Finally, the requirement that the "State commission" determine the wholesale discount prices, 47 U.S.C. § 252(d)(3), negates any inference that GTE is entitled to negotiate different wholesale discounts with each CLEC.

The court also acknowledges the PUC's concern that the cost of negotiating (and possibly litigating) a custom interconnection agreement is prohibitive for many prospective CLECs. In theory, a CLEC could avoid litigation by signing a contract acceptable to GTE, but that effectively would allow GTE to dictate the terms.

■ However, not all CLECs need a custom interconnection agreement. Some CLECs merely want to purchase services for resale, and do not plan to physically interconnect with GTE's network. The PUC is not precluded from adopting a universal "short-form" interconnection agreement for use in this circumstance. Upon signing the agreement, a CLEC could purchase services "off-the-rack" at the established prices.

A universal short-form agreement might also be appropriate for some CLECs purchasing unbundled elements, so long as there is sufficient opportunity for the parties to address any technical issues regarding that interconnection, and the PUC ensures that GTE is compensated (to the extent required by the Act) for any special costs associated with a particular interconnection agreement that are not already included within the unbundled element prices. Of course, a CLEC could still negotiate a custom agreement, if it chose.

Admittedly, the Act does not specifically provide for this short-form procedure, but the Act does not forbid it either. The primary goal of the Telecommunications Act of 1996 was to open local telephone markets to competition, and this procedure furthers that goal and is not inconsistent with either the terms or the purposes of the Act.

■ Although the court rejects GTE's contention that wholesale discounts, unbundled element prices, and other terms invariably must be separately negotiated with each CLEC, the court nevertheless agrees with GTE that the tariff—as presently structured—conflicts with the Act

with those claims over which the court has original jurisdiction.

and is preempted. The record reflects that the PUC has not merely adopted a short-form interconnection agreement, along with a list of resale and unbundled element prices that will be incorporated in those agreements. Rather, the PUC has dispensed with the interconnection agreement altogether and is allowing CLECs to order services "off the rack" without an interconnection agreement. *See* PUC Order No. 98–444, p. 46–47 (Nov. 13, 1998).

The distinction is an important one. 47 U.S.C. § 251(d)(3) preserves the PUC's right to enforce state regulations or policies that establish access and interconnection obligations of local exchange carriers, are consistent with the requirements of § 251, and do not substantially prevent implementation of either the requirements of § 251 or the purposes of "this part" (*i.e.,* 47 U.S.C. §§ 251 through 261).

Here, however, the state has done more than simply enforce additional state requirements. It has required GTE to sell unbundled elements or services for resale, to CLECs, via a procedure that bypasses the Act entirely and ignores the procedures and standards that Congress has established.

The PUC may take steps to expedite the interconnection process, but it must do so within the overall framework established by the Act.[15] Before purchasing finished services or unbundled elements from an ILEC, each CLEC must enter into an interconnection agreement. GTE must have the right to ask the CLEC, and the PUC, to include additional or different terms in a particular agreement if GTE believes special circumstances exist. With the exception of negotiated deviations as provided in § 252(a)(1), the agreement must comply with the substantive standards established by the Act (and by the FCC, where appropriate). Finally, GTE must have the right to seek judicial review of any agreement by the federal court pursuant to § 252(e)(6).[16]

47 U.S.C. § 252(f)(1) does not compel a different result. That section provides that a "Bell operating company may prepare and file with a State commission a statement of the terms and conditions that such company generally offers within that State . . . ." (emphasis added). Section 252(f)(1) gives the ILEC the option to file such a statement. It does not authorize the PUC to compel such a filing. Nor is it clear that a § 252(f) filing entirely dispenses with the interconnection agreement process. *Cf.* § 252(f)(5) (filing a § 252(f)(1) statement does not relieve a Bell operating company of its duty to negotiate an interconnection agreement). In any event, GTE is not a Bell operating company.

The court concludes that the challenged tariff is preempted by the Act, to the extent GTE is required to sell unbundled elements or finished services to a CLEC that has not first entered into an interconnection agreement with GTE pursuant to the Act.

At oral argument, the court was advised that OGI is the only CLEC purchasing unbundled elements from GTE via the tariff and without an interconnection agreement. *See* also PUC Order No. 98–444, p. 46. To minimize disruption to customers,

---

**15.** The issue here is limited to provision of telephone services by an ILEC. The court expresses no opinion regarding a state or local government's right to take other actions aimed at opening local telephone markets to competition, such as unbundling the local cable television infrastructure, or regarding the procedures to be utilized in that circumstance.

**16.** The PUC's tariff proposal would greatly complicate the judicial review process. Either the state court would have to decide whether the provisions of the tariff are consis-

tent with the Act (notwithstanding the exclusive federal jurisdiction conferred by § 252(e)(6)), or else the federal court would somehow have to review PUC tariff decisions, shaping Oregon law, which has historically been the province of the state courts. It is not clear whether the federal court could review the substance of the decision, even if it were arbitrary and capricious, since the tariff procedure arises outside the Act and federal jurisdiction would be based on preemption. Nor is it clear what standard of review the federal court would apply in that circumstance.

the PUC may allow OGI to continue purchasing elements under the tariff for a reasonable period of time until an interconnection agreement between OGI and GTE is approved.[17]

### 6. *Recombining and Restrictions on Separating Elements*

47 U.S.C. § 251(c)(3) requires an ILEC "to provide ... access to network elements on an unbundled basis .... in a manner that allows requesting carriers to combine such elements in order to provide" telecommunications service. To implement that section, the FCC promulgated 47 C.F.R. § 51.315 ("Rule 315"). Rule 315(b) prohibits an ILEC from separating "requested network elements that the incumbent LEC currently combines" unless asked to by the requesting CLEC. Rule 315(c) through (f) would have required an ILEC, upon request from a CLEC, to "perform the functions necessary to combine unbundled network elements in any manner, even if those elements are not ordinarily combined in the incumbent LEC's network" and also to "combine unbundled network elements with elements possessed by the requesting telecommunications carrier in any technically feasible manner."

The Eighth Circuit vacated paragraphs (b) through (f) of Rule 315 because it believed those provisions conflict with the text and the overall design of the Act. *Iowa Utilities*, 120 F.3d at 813. Those provisions would, by analogy, allow a CLEC to obtain a finished car for the price of the unassembled parts, but the Act already provides a separate path for CLECs to purchase the finished car for resale. In addition, the Act contemplates that ILECs will supply CLECs with "unbundled" elements, which the CLEC will recombine itself, 47 U.S.C. § 251(c)(3), yet Rule 315 compelled the ILECs to furnish the elements already combined.

In *AT & T*, the Supreme Court partly reversed the Eighth Circuit, reinstating Rule 315(b). —— U.S. at ——–——, 119 S.Ct. at 737–38. The Supreme Court reasoned that "unbundled network elements" means only that separate prices must be quoted for each element, not that the elements themselves are separated. *Id.* The Court equated separating network elements with "sabotage." *Id.* However, the Eighth Circuit's decision vacating paragraphs (c) through (f) of Rule 315 was not appealed, hence those paragraphs continue to be void.

The first step, in applying the Supreme Court's decision, will be to determine what network elements GTE "currently combines" and what that term entails. The Supreme Court decision seems to envision physical combinations of elements, such as the parts in a transmission. However, the court's understanding is that network elements often consist of little more than electronic signals or pulses of light, and the associated software and hardware that generates, processes, and combines those electronic signals and light pulses.[18] Thus,

---

17. OGI has not moved to intervene, and no party has suggested that OGI's presence in this litigation is required.

18. For instance, FCC Commissioner Powell has said that:
 [T]he network elements that the Commission has held must be "unbundled" are not actually tangible, physical elements that can be unplugged and replugged as easily as an electric cord from a wall socket ... With the exception, perhaps, of loops and ports, the "unbundling" of network elements is not a physical process but a cost allocation fiction. Most UNE's—though representing discrete functional capabilities that one can offer and charge for separate-

ly—cannot in any real sense be dissociated from the software and hardware that control their operation ... [W]e should be dedicating our efforts toward crafting a method for allocating costs for UNEs that simulates the fiction of unbundling and rebundling, rather than spending time pretending that there are actually ways to take these elements apart, hand them to an entrant, and have that entrant put them back together like pieces in a Lego play set.
 *Application of BellSouth Corp. Pursuant to Section 271 of the Communications Act of 1934,* 13 FCCRcd. 539, FCC No. 97–418 (Dec. 24, 1997) (separate statement of Commissioner Powell).

the issue may be more complex than the Supreme Court's opinion suggests. These technical questions should be addressed, in the first instance, by the PUC rather than by this court.

The procedural posture on this issue also favors allowing the PUC to address the matter first. Rule 315 was not among the FCC regulations stayed by the Eighth Circuit on October 15, 1996, which means it was in effect when this Agreement was approved by the PUC, and the Agreement was drafted accordingly. Following the Eighth Circuit's decision vacating most of Rule 315, the PUC ordered the parties to modify the Agreement to eliminate provisions that violate the Eighth Circuit's ruling. PUC Order No. 98–467 (Nov. 13, 1998). Before that could be done, the Supreme Court partly reversed the Eighth Circuit, reinstating Rule 315(b). MCI has now asked the PUC to reconsider Order No. 98–467. The PUC's resolution of that motion could moot or alter the posture of this claim.[19]

Finally, the court observes that the Agreement in question will expire shortly. Instead of arguing over what the old agreement should have said, the parties' efforts should instead be directed toward negotiating terms for the replacement agreement, which everyone agrees will be subject to Rule 315(b).

The court remands this issue to the PUC for such further proceedings as that agency deems appropriate.

### 7. Which Elements Must be Unbundled

In *AT & T*, the Supreme Court invalidated 47 C.F.R. § 51.319 ("Rule 319") and, by implication, 47 C.F.R. § 51.317 as well. *AT & T*, —— U.S. at —— – ——, 119 S.Ct. at 734–36. These rules list the network elements that ILECs must unbundle. The Court concluded that the FCC applied the

wrong legal standard when it compiled the list. *Id.*

The Supreme Court's decision will have little practical impact on the present MCI–GTE Agreement, at least with regard to the network elements listed in Rule 319. GTE (and other ILECs) have assured the FCC that they will honor their contractual obligations and continue to furnish those elements through the end of this year.[20] By then, a replacement FCC rule should be in effect, as well as a new MCI–GTE Agreement. In addition, even apart from Rule 319, the Act itself requires GTE to supply network elements meeting certain criteria. If necessary, this court could apply those criteria and decide which elements must be supplied, pending the new rulemaking. However, in light of GTE's voluntary commitment, that will not be necessary.

 With regard to the merits of this claim, GTE challenges the PUC's decision to unbundle directory listing, billing, and collection services (as opposed to the data needed to perform those tasks). The Supreme Court's decision makes clear that operator services and directory listings, along with the software to manage billing and ordering, can be classified as a network element even though those elements are not directly utilized to provide a dial tone or carry communications traffic. *AT & T*, —— U.S. at ——, 119 S.Ct. at 734.

There is a point, though, at which a particular service is too remote to justify inclusion as a network element. For instance, a good pension plan might be useful in operating a telephone network, but the Act cannot be construed to require GTE to unbundle its pension plan. Some things the CLECs must do for themselves. The unbundling requirement is aimed at

---

19. The PUC also has been considering whether to order recombination of elements under the authority of state law. See PUC Order No. 98–444 (Nov. 13, 1998), pp. 11–13. The court expresses no opinion on the legality of such a requirement. However, it is an additional reason for this court to wait until the

PUC decides how it wishes to proceed in the aftermath of the Supreme Court ruling.

20. Letter from William P. Barr to Lawrence Strickling, Chief of the FCC's Common Carrier Bureau, dated February 12, 1999.

making available to CLECs those network features, which a CLEC needs to provide competitive local telephone service, that GTE either has exclusive access to by virtue of its longstanding monopoly over local telephone service, or which competitors could not otherwise duplicate in a timely manner or at a reasonable cost. The unbundling requirement ordinarily should not extend to general business services that can be replicated by competitors.

In evaluating GTE's claim, the court is handicapped by the failure of the parties to define what is meant by terms such as "collection services," which conceivably might include anything from custom databases and software programs to a room full of employees who call customers to demand payment of past-due bills. The latter would appear to be a service that MCI can and should provide for itself. From the limited description supplied by the parties, the court is unable to say that the PUC erred by ordering GTE to unbundle these particular elements. However, GTE is not precluded from asking the PUC to revisit this issue during the next round of contract negotiations. In the interim, if GTE believes that MCI is interpreting the term "collection services" too expansively, and demanding services that exceed the parameters delineated in the preceding paragraphs, GTE may seek relief through the contractual dispute resolution procedure.

## 8. *Dark Fiber*

GTE contends that the PUC applied an erroneous legal standard when it decided that GTE must unbundle its dark fiber. FCC Rule 319 required ILECs to unbundle certain elements. 47 C.F.R. § 51.319. Other decisions, such as whether to unbundle dark fiber or subloops, were delegated to each state PUC, applying the standards established by the FCC in 47 C.F.R. § 51.317 ("Rule 317"). In *AT & T*, the Supreme Court vacated Rule 319, and by implication Rule 317 as well.

This court previously rejected the argument that dark fiber is not subject to unbundling because it is not "presently" in use. *US West v. AT & T*, 31 F.Supp.2d at 854. The court adheres to that ruling today. However, in light of the Supreme Court's interpretation of the Act, this court agrees that the PUC did not adequately consider whether MCI has comparable alternatives to using GTE's dark fiber. Reconsideration therefore is required.

The court acknowledges, though, that it may be futile to spend months briefing and deciding this issue in the context of the present Agreement, which expires shortly. The FCC's forthcoming rulemaking may also moot this dispute or cast it in a different light. Therefore, on remand, the PUC may choose to defer resolution of these issues until it considers the proposed replacement MCI–GTE Agreement later this year.

## 9. *Shared Transport*

GTE concedes that the FCC has classified shared transport as a network element that must be unbundled, and the Eighth Circuit affirmed that determination in *Southwestern Bell Tel. v. Federal Communications Comm'n*, 153 F.3d 597 (8th Cir.1998). Presumably, the FCC will revisit that decision now that the Supreme Court has rejected the standards used by the FCC to compile its list of network elements that must be unbundled.

 For now, GTE has given this court no reason to conclude that shared transport should not continue to be unbundled pending the FCC's revised decision. GTE contends that MCI has adequate alternative sources for shared transport because MCI already purchases that service from GTE under an existing tariff. However, the ability to purchase a comparable service from the ILEC at a higher price does not appear to be what the Supreme Court had in mind when it reversed the FCC for, *inter alia*, failing to adequately consider "the availability of elements *outside* the incumbent's network." *AT & T*, ─── U.S. at ───, 119 S.Ct. at 735 (emphasis added). Moreover, if there is a signifi-

cant cost difference between the tariffed service and the unbundled element, it is unlikely that the higher priced service would be deemed comparable.

### 10. *Collocation of RSUs*

This court previously upheld a decision by the PUC to order collocation of a Remote Switching Unit ("RSU" or "RSM"), although the court questioned the FCC's contention that a piece of equipment is "necessary" for interconnection, and collocation must be authorized, so long as the equipment is "used and useful" for that purpose. *US West v. AT & T*, 31 F.Supp.2d at 854, n. 9. The word "necessary" suggests a stricter standard. Anyone who has ever packed for a trip knows the difference between items that might be "used and useful" versus items that are really "necessary." The FCC's loose interpretation of "necessary" seems especially inappropriate when authorizing a physical occupation of the ILEC's property.

In light of the Supreme Court's recent decision, the FCC's interpretation of the word "necessary" in 47 U.S.C. § 251(c)(6) is no longer tenable. *See AT & T*, —— U.S. at —— ——, 119 S.Ct. at 734–36 (rejecting the FCC's application of the "necessary" and "impair" standards in Rules 317 and 319, and declaring that the FCC "has not interpreted the terms of the statute in a reasonable fashion"). Although the FCC's collocation rule, 47 C.F.R. § 51.323 ("Rule 323"), was not directly at issue in *AT & T*, similar defects are present in Rule 323(b). The FCC appears to have applied the same unacceptable definition of "necessary," and the same expansive view of the ILEC's obligations, in Rule 323(b) as it did in Rules 317 and 319. *See AT & T*, —— U.S. at ——, 119 S.Ct. at 736. In the aftermath of *AT & T*, it is clear that the FCC will have to reconsider Rule 323(b) as well.

■■■ The PUC's decision provides little justification for its decision to authorize collocation of RSUs, apart from relying upon the FCC's flawed interpretation of the Act. GTE contends that MCI's reasons for collocating RSUs have less to do with their usefulness for interconnection or gaining access to unbundled elements and more to do with MCI's desire to use the RSUs for purposes that do not justify collocation under 47 U.S.C. § 252(c)(6) and Rule 323. The court will remand this issue to the PUC for reconsideration and to articulate a clearer explanation for the decision.

In footnote 38 of its brief, MCI asserts that once it collocates an RSU in GTE's premises, MCI may use that equipment for any purpose at all (unless expressly prohibited by the contract), and not just for the limited functions that MCI cited to justify its request for collocation. GTE cries foul, and sees a Trojan Horse. To avoid future disputes, the Agreement should explicitly state the purposes for which this equipment may (or may not) be used, or the absence of such restrictions.

### 11. *Pick–And–Choose Clause*

GTE's challenge to the "pick-and-choose" clause, also known as a "most favored nation" clause, fails following the Supreme Court's decision affirming the FCC's rule, 47 C.F.R. § 51.809. There are no retroactivity issues here, since this requirement is mandated by the Act. *AT & T*, —— U.S. at ——, 119 S.Ct. at 738.

### 12. *PUC's Conditional Approval of Proposed Agreement*

■■■ GTE contends that the PUC had to either approve the Agreement in its entirety, or reject the Agreement, but could not conditionally approve the Agreement subject to certain modifications. The court disagrees. 47 U.S.C. § 252(e)(1) provides that "[a] State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies." The PUC declined to approve the Agreement as proposed, and gave the parties a list of the modifications they had to make before the PUC would approve the Agreement. The parties made those modifications, and

the PUC then approved the Agreement. This procedure did not violate § 252(e)(1).

Even if GTE was effectively compelled to accept those modifications, under the law it had little choice in the matter. This was not a private contract which GTE could decline to sign. The Act requires that GTE enter into an interconnection agreement with a requesting CLEC. The PUC had told GTE what changes had to be made to gain the PUC's approval. The time for argument was over. GTE could not indefinitely stall the signing of this contract, and MCI's entrance into the local telephone market, by resubmitting an Agreement that did not comply with the PUC's decision.

### 13. *Poles, Ducts, Conduits, and Rights of Way*

It is not clear what GTE is arguing in this claim. Based upon the minimal discussion in GTE's briefs, the court will construe this claim as a general assertion that GTE is not required to give CLECs access to its poles, ducts, conduits, and rights-of-way, because it would "abrogate GTE's ownership interests." That is incorrect. *See* 47 U.S.C. §§ 224(f)(1), 251(b)(4). GTE is entitled to compensation for that use, but the Agreement specifically provides for this.

### 14. *Performance Standards and Penalties*

At issue here is the PUC's rejection of MCI's proposed performance standards and penalties (if GTE did not meet those standards). This court previously held that the decision to "include performance standards and specific remedies in [an] interconnection agreement . . . is a discretionary decision on the part of the PUC,

and this court will not disturb that decision unless it is arbitrary and capricious or violates the Act." *MCI v. U.S. West*, 31 F.Supp.2d at 861.

The PUC offered a cogent explanation for its decision, there is substantial evidence in the record to support that decision, and the court finds no violation of the Act.

### 15. *Limitation of Liability Clause*

 MCI objects to a clause that limits GTE's liability for consequential damages, on account of service outages or similar deficiencies in service, to cases of "wilful misconduct." MCI contends that under Oregon law, the PUC may not immunize a utility from liability for consequential damages for either wilful misconduct *or* "gross negligence." All of the cases cited by MCI concern liability to a subscriber or other person, not liability between two telecommunications carriers. *See, e.g., Olson v. Pacific Northwest Bell Tel. Co.*, 65 Or.App. 422, 671 P.2d 1185 (1983); *Garrison v. Pacific Northwest Bell*, 45 Or.App. 523, 531–32, 608 P.2d 1206 (1980). It is unclear whether Oregon would apply the same rule in this circumstance. The Oregon courts have recognized a distinction between a tariff that purports to limit liability under tort versus a tariff that limits remedies for breach of contract. *Simpson v. Phone Directories Co.*, 82 Or.App. 582, 585–87, 729 P.2d 578 (1986).[21] Oregon also has recognized that limitations on liability are an "inherent part of the rate" set by the tariff. *Id.*

This court can certainly understand why the PUC would want to restrict GTE's liability to CLECs for "gross negligence." Woe unto the court that must adjudicate

---

**21.** *Simpson* appears to confine the "gross negligence" exception to tort cases, and preclude liability for consequential damages in actions for breach of contract even if the breach was the result of gross negligence. However, in *Hoeck v. U.S. West Communications*, Civil No. 95–35561, the Ninth Circuit reversed this court and reinstated a breach of contract claim. The panel concluded that under Oregon law, the PUC could not limit liability for gross negligence even in breach of contract cases. 112 F.3d 516, 1997 WL 207902 (9th Cir.1997) (unpublished). These differing interpretations of the same precedents are added reason for allowing the Oregon courts to decide what Oregon law is on this issue.

the "real" reason why a CLEC's business failed, or why the customers did not come as expected, or even the reasons for any service deficiencies.[22] Whether Oregon law allows the PUC to limit GTE's liability in this manner is another question.

Because this is a novel question of state law, which concerns matters of public policy involving utility regulation, the court will limit its decision to a determination that the challenged provision does not violate the Act. In the event that MCI ever brings an action against GTE premised upon gross negligence, the court hearing that action can decide whether the limitation of liability clause in the Agreement is valid under Oregon law.

### 16. *Superior Quality*

In view of the short term remaining on this contract, the court affirms the PUC's resolution of the superior quality issue in Order No. 98–467 (Nov. 13, 1998), with the understanding that the "unable to agree" clause on page 8 of that order includes an implied "good faith" requirement.

### 17. *Customer Proprietary Network Information (CPNI)*

CPNI encompasses a wide range of information about individual customers, which include everything from what telephone services the customer presently receives to historical databases that may reveal how much the customer spends, how promptly he pays his bill, and even who the customer calls and how often. Such information can be used (and abused) for many purposes.

The dispute here concerns GTE's obligation to disclose a customer's CPNI to MCI or to any other CLEC that claims the customer either (1) has decided to switch local telephone service carriers or (2) has authorized disclosure of the customer's CPNI. GTE acknowledges that it must furnish a customer's CPNI to any person designated by that customer, upon receiving a written request. 47 U.S.C. § 222(c)(2). However, MCI wants the right to obtain that CPNI based solely upon its representation that the customer has orally authorized disclosure of his CPNI or the transfer of his telephone service.

Citing both privacy concerns and the proliferation of "slamming" (*i.e.*, telecommunications carriers or telemarketers who falsely represent that a customer has authorized a change in service), GTE wants MCI and other CLECs to furnish written authorization signed by the customer before GTE will disclose that customer's CPNI.

The arbitrator, citing "great concern" about customer privacy and the potential for unauthorized carrier changes (*i.e.*, slamming), concluded that GTE should not be required to disclose CPNI to MCI without a written authorization from the customer. Order 97–038, p. 23. The arbitrator also noted that the "FCC now has pending a rulemaking proceeding to determine how CPNI should be protected when a customer changes local service providers," and GTE had agreed "to comply with the procedures that the FCC adopts in a final order regarding the release of CPNI to CLECs. Until that time, it is prudent to adopt procedures that strictly protect the interests of the customers." *Id.* The PUC affirmed the arbitrator's decision. MCI then sought review by this court.

While that claim was pending, the FCC issued its *Second Report and Order and Further Notice of Proposed Rulemaking regarding Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, 13 FCCRcd. 8061, FCC No. 98–27 (Feb. 25, 1998) (regulations codified at 47 C.F.R. part 64, subpart U) ("CPNI regulations").

MCI contends that the FCC's CPNI regulations endorse MCI's interpretation

---

**22.** This court has personal experience with such cases. *See Central Office Tel., Inc. v. AT & T*, Civil No. 91–1236–JE (D.Or.1994), *aff'd in part and rev'd in part*, 108 F.3d 981 (9th Cir.1997), *rev'd in part*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)

of the statute, and urges this court to reverse the PUC's decision. The PUC apparently has not specifically considered this issue, but its counsel has filed a brief stating that MCI's position is not prohibited by the FCC's CPNI regulations. GTE responds that even assuming the CPNI regulations do not prohibit adoption of MCI's position, they don't mandate it either, nor do they preclude GTE's proposal.

The court has reviewed the FCC's CPNI regulations and the voluminous Second Report and Order (with its 748 footnotes). If those documents were intended to address "how CPNI should be protected when a customer changes local service providers," it is not evident to this court. The parties have not pointed to any place in the report where that subject is even mentioned. Rather, the Second Report and the CPNI regulations focus upon a carrier's right to use CPNI to market additional products and services to its *existing* customers, or to permit its own affiliates to use that information to market other services such as long distance or cellular. Thus, the report and regulations center upon the scope of the customer's relationship with its existing carrier, the customer's reasonable expectations as to how its existing carrier might use this information, and whether the existing carrier will use that information to market products in the same category of services that the customer already receives from this carrier. The parties have not pointed to any discussion in the report or regulations of the procedures to be utilized when changing carriers. Slamming—which would surely be at the center of any discussion about disclosure of CPNI when a customer purportedly changes carriers—is barely even mentioned in the report. Absent a clearer statement from the FCC, the court is not persuaded that the Second Report and the FCC's present CPNI regulations directly address the question presented here. Consequently, the future event contemplated in the arbitrator's decision—the enactment of FCC rules that "determine how CPNI should be protected when a custom-er changes local service providers"—has not yet occurred.

The court also concludes that 47 U.S.C. § 222(c) does not expressly require, nor forbid, the positions advocated by each side. Until such time as the FCC issues additional regulations specifically governing this issue, the PUC may require MCI to provide written authorization from the customer before GTE must disclose CPNI to MCI, or the PUC may decide that oral authorization is adequate. The PUC may also differentiate between the types of CPNI requested. For instance, information about the mix of services the customer presently subscribes to from GTE might be provided upon oral authorization, since MCI would need that information to switch service and it is of a less personal nature, while some other types of CPNI that contain more sensitive information (from the standpoint of the customer) might require written authorization to release.

The court rejects MCI's claim that a written authorization requirement discriminates against MCI because GTE does not need written authorization to use its own customer's CPNI. Not every distinction is unlawful discrimination. Some distinctions are justified by the facts.

Within the confines of its own company, GTE is willing to accept an oral representation that the customer has approved use of CPNI. GTE knows and trusts its own employees, and the procedures it utilizes to ensure the integrity of that process. It would be a different matter if Fly–by–Night CLEC tells GTE it has talked to GTE's customer and obtained oral consent for GTE to give Fly–by–Night that customer's personal account information. Given the prevalence of slamming and other abuses, GTE understandably wants to see written authorization from the customer before disclosing sensitive personal information to a third party.

Since the PUC has not had an opportunity to reconsider this issue since the Second Report was issued, the court will re-

mand this issue to the PUC for further consideration.

### 18. *Other Claims*

GTE did not brief the remaining claims set forth in its Amended Counterclaim and Cross-claims. Those claims are therefore deemed to have been abandoned.

### *ORDER*

**Regarding MCI's Amended Complaint:**

MCI's Motion for Summary Judgement (docket # 61–1) and the PUC's Motion for Summary Judgment Against MCI (docket # 92–1) and GTE's Cross–Motion for Summary Judgment against MCI (docket # 96–1) are each GRANTED IN PART and DENIED IN PART as follows.

Summary Judgment is GRANTED in favor of the PUC and GTE, and against MCI, on Count I (failure to include performance standards and penalties), Count III (failure to deaverage loop prices), Count IV (volume and term discounts), and also on Count V (limitation of liability clause) with the understanding that the court expresses no opinion on whether that clause is enforceable under Oregon law.

Count II (CPNI) is REMANDED to the PUC for further consideration.

**Regarding GTE's Amended Counterclaims and Cross-claims:**

GTE's Motion (docket # 65–2) to Dismiss its State Law Claims (Counts VI, VII, and VIII) without prejudice is GRANTED. GTE's alternative Motion for Leave to Amend (docket # 65–1) is MOOT. GTE's Motion (docket # 121–1) for a Stay of the proceedings is DENIED.

GTE's Motion for Summary Judgment (docket # 56–1 and 56–2), the PUC's Motion for Summary Judgment Against GTE (docket # 100–1), and MCI's Motion for Summary Judgment against GTE (docket # 98–1) are each GRANTED IN PART and DENIED IN PART as follows.

Counts I(C), (E), (F), (G), and (H) (pricing of transport and termination, access to poles, interim number portability, addition-al features and functions, query access, and residual interconnection charges), Count II(D) (required modifications to network), item B in ¶ 214 of Count II(E) (reservation of space for own use), and items A, B, and C of ¶ 221 in Count II(G) (LERG reassignments, SS7 access, and 30–day deadline), are deemed to have been ABANDONED by GTE and judgment is therefore entered in favor of the PUC and MCI and AGAINST GTE.

The court DISMISSES, WITHOUT PREJUDICE, the portion of Count I(A) (wholesale discounts) that challenges the methodology used by the PUC to compute the wholesale discount. The court REMANDS to the PUC, for further consideration, GTE's contention that the PUC erred by adopting a unitary discount rate and by failing to compensate GTE for the additional costs it will incur in providing services at wholesale to MCI.

Paragraph 162 of Count I(B), and Count I(D) (challenge to unbundled network element pricing methodology, end-user surcharge, and stranded costs), are DISMISSED WITHOUT PREJUDICE. Judgement is entered AGAINST GTE on the remainder of Count I(B) and Count I(I) (various procedural challenges to unbundled element prices).

Judgment also is entered AGAINST GTE on Count II(F) (duty to give CLECs access to poles), part E of ¶ 221 of Count II(G) (pick-and-choose rule), Count III (failure to follow arbitration procedures), and Count IV (acts in excess of jurisdiction).

On Count V (tariffs), judgement is entered in FAVOR OF GTE on its claim for declaratory relief. The PUC may not compel GTE to sell unbundled elements to a CLEC that has not first entered into an interconnection agreement with GTE pursuant to the Act. The PUC may allow existing customers (*i.e.,* OGI) to continue purchasing elements under the tariff for a reasonable period of time until an interconnection agreement between OGI and GTE is approved. GTE's alternative

claim, for violation of 42 U.S.C. § 1983, is MOOT.

With regard to part D of ¶ 221 of Count II(G) (superior quality), the court affirms the PUC's resolution of this issue in Order No. 98–467 (Nov. 13, 1998), with the understanding that the "unable to agree" clause on page 8 of that order includes an implied "good faith" requirement.

On Count II(C) (which services are subject to wholesale discount), the court concludes that COCOT coin and coinless services, and semi-public and public pay phone lines, are services that GTE provides at retail to subscribers who are not telecommunications carriers and therefore must be offered at a wholesale discount. The parties have until March 31, 1999, to file supplemental briefs concerning directory assistance and operator services, non-recurring costs, and individual case basis contracts.

Count II(A) (sham unbundling), along with any related issues concerning recombination of elements for CLECs or prohibitions upon separation of elements, is REMANDED to the PUC for such further proceedings as that agency deems appropriate.

On Count II(B) (which elements must be unbundled), judgment is entered AGAINST GTE on all items except for dark fiber, which is REMANDED to the PUC for reconsideration.

Count II(E) (collocation of RSUs) is REMANDED to the PUC for reconsideration.

IT IS SO ORDERED.

### OPINION AND ORDER ON RECONSIDERATION

Plaintiffs MCI Telecommunications Corp. and MCImetro Access Transmission Services, Inc. (collectively "MCI"), bring this action under 47 U.S.C. § 252(e)(6) against GTE Northwest, Inc. ("GTE"), the Oregon Public Utility Commission ("PUC"), and PUC Commissioners Roger Hamilton, Ron Eachus, and Joan Smith. GTE has asserted counter-claims against MCI and cross-claims against the PUC.

The dispute concerns the terms of an interconnection agreement ("Agreement") between MCI and GTE, which is intended to facilitate competition in local telephone service. Each party moved for summary judgment.

Most of the issues in this case were resolved by the court's opinion and order dated March 17, 1999, *MCI Telecom. Corp. v. GTE Northwest, Inc.*, 41 F.Supp.2d 1157 (D.Or.1999). However, the court had requested supplemental briefing on whether directory assistance and operator services, non-recurring costs, and individual case basis contracts are services that GTE provides at retail to subscribers who are not telecommunications carriers for purposes of the resale requirements of 47 U.S.C. § 251(c)(4). In addition, GTE has moved for reconsideration of one portion of the court's prior decision.

### 1. Whether Specified Services are Subject to § 251(c)(4).

#### A. Propriety of Request for Supplemental Briefing

Before reaching the merits, the court will address GTE's objection to the request for supplemental briefing.

GTE argues that the scope of judicial review is limited to the administrative record, hence the court may not direct the parties to provide additional facts. If the existing record is inadequate, GTE contends, then the PUC's decision was arbitrary and capricious and must be vacated.

At the outset, GTE is assuming that it will be necessary to go outside the existing record to answer the court's questions. The requested information may be in the voluminous administrative record, in which case the parties need only point to the relevant documents. From the responses filed by the parties, it appears that much of the requested information also is contained in existing tariffs on file with the PUC, which are public records.

**1188**

Furthermore, GTE is the proponent of these claims. Reversing the PUC in this circumstance would perversely reward GTE for its failure to brief the issue fully and to ensure that an adequate record was established below.

■ Finally, there are circumstances when a court reviewing an administrative decision may permit supplementation of the administrative record, including: (1) if necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) "when the agency has relied on documents not in the record," and (3) "when supplementing the record is necessary to explain technical terms or complex subject matter." *Inland Empire Pub. Lands Council v. Glickman,* 88 F.3d 697, 703–04 (9th Cir.1996).

■ The information requested by the court falls squarely within these exceptions. When the Forest Service decides whether to approve a particular timber sale, the record need not explain what a "tree" is. Certain concepts are part of the background knowledge that an agency and the parties may be presumed to possess.

In the instant case, when the PUC decided that certain specified services that GTE offers should be subject to the wholesale discount, the PUC and GTE both understood what those services were and the terms under which GTE has been offering those services for a number of years with the PUC's approval. These are not disputed facts, but merely part of the general background knowledge that both these parties possess, just as they both have a general understanding of how local telephone service operates. The court does not have this same technical expertise and background knowledge.

In resolving this case, it is entirely appropriate for the court to ask the parties whether retail subscribers are charged for the directory assistance services in question, or to define what an "ICB contract" is and the terms under which it is offered, just as the court may ask the parties to define technical terms they are using such as "dark fiber" or "feeder distribution in-terface box." Furthermore, a remand to the PUC to expand the record would be a futile gesture if the answers to the court's questions are not in dispute.

**B. Operator Service and Directory Assistance**

■ GTE concedes that, under the terms of its published tariffs, retail customers are billed by GTE for each operator service and directory assistance call (although the first few calls each month may be included in the basic monthly rate). Accordingly, the PUC correctly concluded that these are telecommunications services that GTE provides at retail to subscribers who are not telecommunications carriers, and these services must be offered to MCI at a wholesale discount. 47 U.S.C. § 251(c)(4).

GTE protests that a wholesale discount is improper, since these services have no avoided resale costs. However, that issue is distinct from the question of whether the service must be offered at wholesale to MCI. This court previously directed the PUC to reconsider its decision to set a unitary discount for all services being offered at wholesale, regardless of the level of costs savings that can be achieved for any particular service. *MCI v. GTE,* 41 F.Supp.2d at 1174. GTE's contention that there are little or no avoided resale costs for operator service and directory assistance should be addressed at that time.

**C. Non-recurring Charges**

GTE concedes that non-recurring charges ("NRCs") are billed to retail subscribers. However, in its supplemental brief, GTE argues that NRCs are not subject to the resale obligation in § 251(c)(4) because they are not "telecommunications services" as defined in 47 U.S.C. § 153(46). GTE did not make that argument in its opening or reply briefs, and the court declines to address it here for the first time. The decision of the PUC is therefore affirmed, but the court expresses no opinion

on whether NRCs are a "telecommunications service."

### D. Individual Case Basis Contracts

After reviewing the supplemental briefs, the court has decided to remand this issue to the PUC for further consideration and to let the agency articulate a more complete explanation of the issue and its decision. Even assuming an individual case basis ("ICB") contract is a retail service— a question the court does not decide at this time—there are many unanswered questions concerning how the resale of this "service" would operate in practice, the scope of the service being resold (*e.g.*, is it the entire contract, or can MCI pick out subcomponents thereof), how these service(s) will be priced, or how a wholesale price can be set once the customer no longer has a contract with GTE (yet the wholesale price apparently depends upon the price that GTE negotiates with this particular customer). The issue is complicated by "termination liabilities" owed to GTE if the customer elects to obtain service from another carrier.

A more complete understanding of the issue, and of the substance and rationale for the PUC's decision, is required before the court can rule on GTE's contention that the PUC erred by treating ICB contracts as services subject to the resale requirements of § 251(c)(4).

### 2. Clarification of Prior Opinion

The court previously held that the PUC did not err by failing to apply FCC regulations that were not in effect at the time the PUC approved the MCI–GTE Agreement. *MCI v. GTE,* 41 F.Supp.2d at 1162-67. The court did not address whether a party may petition the PUC to modify the Agreement once the FCC regulations take effect, or whether the PUC could or should grant such a request. Nor did the court address whether the PUC must apply the reinstated FCC regulations when reconsidering an issue that has been remanded for other reasons. Those issues were not before this court.

### 3. GTE's Motion for Reconsideration

GTE has moved for reconsideration of this court's prior decision concerning which network elements GTE must unbundle in the aftermath of the Supreme Court's decision invalidating 47 C.F.R. § 51.319 ("Rule 319"). *See MCI v. GTE,* 41 F.Supp.2d at 1179-81.

GTE contends that this court misconstrued a letter, from GTE to the FCC, in which GTE agreed that "during the FCC proceeding on remand from the Supreme Court, GTE will continue to make available each of the individual network elements defined in the now-vacated FCC rules and our existing interconnection agreements." Letter from William P. Barr to Lawrence Strickling, Chief of the FCC's Common Carrier Bureau, dated February 12, 1999.

GTE contends that its offer was subject to an important caveat: that GTE would provide network elements *only* if GTE could provide "individual—that is, not combined—elements." GTE's Memorandum in Support of Motion for Reconsideration at 2. However, that caveat is not clear from the face of the letter. Although GTE now claims this was an essential condition of GTE's offer, the letter does not explicitly mention this condition.

That might end the matter, except GTE has now furnished the court (for the first time) with copies of letters that GTE sent to the PUC and MCI contemporaneously with the letter to the FCC. Those letters indicate that—at least in Oregon—GTE told the PUC and MCI that its offer to continue providing network elements was subject to several conditions, including that the elements would be separated. MCI and the PUC were aware of those conditions, from their separate correspondence with GTE, and thus were unlikely to have been misled by GTE's letter to the FCC.

If GTE's offer to provide network elements in Oregon is in fact conditioned upon those elements being separated, it is

not much of a bargain. Under the terms of the MCI–GTE Agreement, GTE is already contractually obligated to provide these network elements to MCI without the condition that GTE now seeks to add.

 GTE seems to be contending that when Rule 319 was struck down, GTE no longer was "[required] to make available *any* network elements at *all*." GTE's Memorandum at 6 (emphasis in original). The court disagrees. The Act remains in effect, as does the MCI–GTE Agreement. GTE must fulfill its existing contractual obligations to MCI unless, and until, a court (or the PUC, if appropriate) duly relieves GTE of those obligations.

Alternatively, GTE asserts that this court must immediately vacate the MCI–GTE Agreement, on the ground that the PUC improperly relied on Rule 319 in determining which elements must be unbundled. GTE thereby arrives at the same conclusion again, namely that GTE isn't compelled to furnish MCI with any elements, and GTE won't voluntarily do so unless MCI agrees to let GTE separate the elements first.

The court is not persuaded. For one thing, GTE's complaint and opening brief both asserted that the PUC did not apply Rule 319 but relied on state law instead. Second, although GTE now purports to have mounted a broad challenge to the entire list of unbundled elements, GTE's complaint and opening brief focused on only a handful of elements. The court fully addressed those specific objections in the prior opinion.

GTE really is attempting to assert a new claim for the first time in a motion for reconsideration.[1] If GTE believes that the Supreme Court's decision provides new grounds for GTE to challenge the terms of the MCI–GTE Agreement, that argument

should be presented in the first instance to the PUC. The court expresses no opinion as to whether the PUC could, or should, entertain that argument, which in essence is a request to reopen the Agreement due to an intervening change of law.

Even assuming, *arguendo,* that the PUC did err by relying on Rule 319, this court and the regulatory agencies are not limited to the stark options GTE has laid out here. The FCC presumably chose not to issue an emergency rule because GTE's letter had seemingly resolved the immediate crisis. If circumstances have changed, the FCC might reconsider its position. The PUC also might issue an interim order listing the elements that GTE must make available pending issuance of the replacement Rule 319. The Act does not require the PUC to sit by helplessly until the FCC completes the rulemaking process.

Likewise, this court's remedies are not limited to meeting GTE's demands or else vacating the Agreement and leaving MCI unable to serve its customers. By interrupting the flow of network elements to MCI or other CLECs, or even by sowing seeds of doubt in the minds of customers and competitors as to its intentions in this regard, GTE could seriously harm competitors while frustrating the Congressional mandate to promote competition for local telephone service in Oregon. The courts have ample authority to ensure that this does not occur.

GTE also argues that this court is engaging in "one-sided enforcement of the law" by "remanding the OPUC's decisions concerning network element combinations in light of the Supreme Court's holding on Rule 315(b)" but not vacating the PUC's decision on network elements. Memorandum at 10. GTE's allegation misapprehends what the court did, the reasons for

---

1. GTE's Memorandum in Support of its Motion for Reconsideration accuses the court of "declin[ing] to address GTE's claims that, in light of the Supreme Court's decision vacating entirely Rule 319, all of the OPUC's decisions on unbundling were based on invalid FCC rules and erroneous FCC constructions of the Act and must be vacated." Memorandum at 9. The simple answer is that GTE never pled such a claim, which is hardly surprising given that all pleadings in this action were filed long *before* the Supreme Court issued its decision.

that decision, and the underlying facts and procedural posture.

GTE next argues that its network element claim should have been dismissed without prejudice, as moot. The court disagrees. GTE argued that "directory listing services, network testing access, and billing and collection services" did not meet the definition of a network element under the Act. GTE's Opening Brief at 42. The court did not dismiss that claim as moot, but decided it on the merits.

GTE does make one valid point. In the prior opinion, the court stated that "GTE (and other ILECs) have assured the FCC that they will honor their contractual obligations and continue to furnish those elements through the end of this year." *MCI v. GTE*, 41 F.Supp.2d at 1180. Although the end-of-the-year time frame was included in similar letters to the FCC from other ILECs, it was not included in GTE's letter to the FCC. The court is presently hearing many telephone cases, with similar facts, and overlooked that distinction between the letters. However, this error did not affect the court's resolution of the issue.

## ORDER

On Count II(C) (which services are subject to wholesale discount), SUMMARY JUDGMENT is entered in favor of MCI and the PUC, and against GTE, on the issues of operator services, directory assistance, and non-recurring charges. The issue of individual case basis contracts is REMANDED to the PUC for further consideration consistent with this opinion.

GTE's Motion for Reconsideration (docket # 142–1) is GRANTED. However, upon reconsideration, the court ADHERES to its earlier decision as clarified herein.

IT IS SO ORDERED.